UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

VAN DYK MORTGAGE CORPORATION,

    Plaintiff,

v.                                                   Case No. 1:06-CV-626

UNITED STATES OF AMERICA,                HON. GORDON J. QUIST
ROGER J. BUFFUM and DAWN M.
BUFFUM,

    Defendants.
_____/

## **OPINION**

Plaintiff, Van Dyk Mortgage ("Van Dyk"), filed its complaint in this action in the Kent County Circuit Court on or around July 27, 2006, against Defendants Roger J. Buffum and Dawn M. Buffum (the "Buffums") and the United States of America ("Government" or "IRS") alleging three counts. Count I alleged a claim for quiet title/equitable subrogation against the Government, Count II alleged a claim for breach of mortgage covenants against the Buffums, and Count III alleged a claim against all Defendants for unjust enrichment. The Government filed a notice of removal on August 31, 2006, pursuant to 28 U.S.C. §§ 1442(a) and 1444. Now before the Court is the Government's motion to dismiss Van Dyk's quiet title/equitable subrogation and unjust enrichment claims. For the reasons set forth below, the Court will grant the motion with regard to the unjust enrichment claim but deny it with regard to the quiet title/equitable subrogation claim.

## **Facts**

The following facts are taken from Van Dyk's complaint and are taken as true for purposes of this motion. On January 11, 2002, the Buffums granted a mortgage to Van Dyk on real property

commonly known as 2898 Alson Drive, N.E., Grand Rapids, Michigan (the "Property"), to secure a loan in the principal amount of $120,400.00 (the "2002 mortgage"). The mortgage was recorded on January 28, 2002, in Liber 5837, Page 220, Kent County Records.

In 2004, the Buffums applied with Van Dyk to refinance the Property, presumably for the purpose of taking advantage of a more favorable interest rate. On June 2, 2004, the Buffums granted a mortgage on the Property to Van Dyk in the principal amount of $148,500 (the "2004 mortgage"). The proceeds of the 2004 mortgage were used, in large part, to pay off the 2002 mortgage. The 2004 mortgage was recorded on June 17, 2004, and Van Dyk discharged the 2002 mortgage by recording a discharge on that date. On June 7, 2004, five days after the Buffums executed the 2004 mortgage but prior to the date the 2004 mortgage was recorded and the 2002 mortgage discharged, the IRS recorded two Notices of Federal Tax Lien against the Property, the first against the Buffums in the amount of $20,803.91, and the second against Roger Buffum in the amount of $46,615.86.

Van Dyk alleges that it had no actual or constructive notice of the IRS' purported interest in the Property at the time the 2004 mortgage was executed and funded. It also alleges that the Buffums never informed it that they were obligated to the IRS or that liens were being recorded against the Property.

**Motion Standard**

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions or legal conclusions. *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citing *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be

2

made in favor of the non-moving party. 2 *Moore's Federal Practice*, § 12.34[1][b] (Matthew Bender 3d ed. 2003). The Court need not, however, accept unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957)).

## Discussion

As mentioned above, the Government has moved for dismissal of both Counts I and III for equitable subrogation and unjust enrichment, respectively. The Government contends that Count I must be dismissed because Van Dyk's claim for equitable subrogation fails for the reason that Van Dyk was a mere "volunteer" in paying off the 2002 mortgage and, thus, under Michigan law, is not entitled to be subrogated to the rights of the 2002 mortgage.

With regard to the unjust enrichment claim in Count III, the Government contends that it is immune from such claims and has not waived its sovereign immunity for unjust enrichment claims. Van Dyk did not address the unjust enrichment claim in its response and, therefore, appears to concede that it is barred by sovereign immunity. In any event, the Court concludes that the motion must be granted on this claim because it is well established that, in the absence of an explicit waiver, there is no general waiver of sovereign immunity by the United States for unjust enrichment claims. *See United States v. Mitchell*, 445 U.S. 535, 538, 100 S. Ct. 1349, 1351 (1980) (noting that a waiver may not be implied but must be unequivocally expressed and that absent clear congressional consent to be sued in a particular court, there is no jurisdiction against the United States); *Chem-Nuclear Sys., Inc. v. Arivec Chems., Inc.*, 978 F. Supp. 1105, 1110 (N.D. Ga. 1997) (dismissing the plaintiff's unjust enrichment claim because the plaintiff failed to identify any waiver by the United States of

3

its sovereign immunity for such claims). Thus, the only contested issue presented in the instant motion is whether Van Dyk is entitled to equitable subrogation based upon the facts alleged in its complaint.

Pursuant to 26 U.S.C. § 6321, "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." State law applies to the determination of the rights an individual possesses in property, *see United States v. Brosnan*, 363 U.S. 237, 240, 80 S. Ct. 1108, 1111 (1960), but federal law dictates whether those rights are "property" or "rights to property" under 26 U.S.C. § 6321. When the priority of competing federal and state liens is at issue, federal law controls. *See Aquilino v. United States*, 363 U.S. 509, 513-14, 80 S. Ct. 1277, 1280-81 (1960); *Blachy v. Butcher*, 221 F.3d 896, 905 (6th Cir. 2000). Pursuant to 26 U.S.C. § 6323(a), when the non-federal interest is a security interest, a federal tax lien arising under 26 U.S.C. § 6321 is perfected only upon the Secretary's filing of a valid notice of the tax lien. *See United States, ex rel. IRS v. McDermott*, 507 U.S. 447, 449, 113 S. Ct. 1526, 1528 (1993). A state lien is entitled to priority over an unrecorded federal tax lien when the state lien is perfected under local law. 26 U.S.C. § 6323(h)(1). "Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that the first in time is the first in right." *Id.* (quoting *United States v. New Britain*, 347 U.S. 81, 85, 74 S. Ct. 367, 370 (1954)) (internal quotations omitted). Thus, as between a state law lien and a federal tax lien, the first perfected lien is entitled to priority. *See United States v. Dishman Indep. Oil, Inc.*, 46 F.3d 523, 526 (6th Cir. 1995). However, § 6323(i)(2) directs that "[w]here, under local law, one person is subrogated to the rights of another with respect to a lien or interest, such person shall be subrogated to such rights for purposes of" a federal tax lien. Therefore, a court must examine state law in determining whether

4

the doctrine of equitable subrogation applies.[1]  *See United States v. Baran*, 996 F.2d 25, 28 (2d Cir. 1993).

The Michigan Supreme Court has described the basic concept of equitable subrogation as follows:

> Equitable subrogation is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted to all the rights and remedies of the other.  It is well-established that the subrogee acquires no greater rights than those possessed by the subrogor, and that the subrogee may not be a "mere volunteer."

*Hartford Accident & Indem. Co. v. Used Car Factory, Inc.*, 461 Mich. 210, 215, 600 N.W.2d 630, 632 (1999) (quoting *Commercial Union Ins. Co. v. Med. Protective Co.*, 426 Mich. 109, 117, 393 N.W.479, 482 (1986) (Williams, C.J.)) (citations omitted).  It is "a flexible, elastic doctrine of equity," *id.* (citing *Atlanta Int'l Ins . Co. v. Bell*, 438 Mich. 512, 521, 475 N.W.2d 294 (1991) (Brickley, J.)), and "[i]ts application 'should and must proceed on the case-by-case analysis characteristic of equity jurisprudence.'" *Id.* at 215, 475 N.W.2d at 632-33 (quoting *Atlanta Int'l Ins. Co.*, 438 Mich. at 516 n.1, 475 N.W.2d at 295 n.1).

Michigan courts have recognized two forms or types of subrogation, as explained in *French v. Grand Beach Co.*, 239 Mich. 575, 215 N.W. 13 (1927):

> The doctrine of subrogation rests upon the equitable principle that one, who, in order to protect a security held by him, is compelled to pay a debt for which another is primarily liable, is entitled to be substituted in the place of and to be vested

---

[1] This Court's task in determining and applying Michigan law is as follows:

A federal court sitting in diversity and applying state law generally must apply the controlling law of the state's highest court.  Where the highest court has not yet ruled on an issue, however, the federal court should predict how that court would rule by examining all the relevant data.  "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [highest court] would decide otherwise." *Allstate Ins. Co. v. Thrifty Rent-A-Car Systems, Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)).

*Toledo Edison Co. v. ABC Supply Co.*, 46 F. App'x 757, 762 (6th Cir. 2002).

5

> with the rights of the person to whom such payment is made, without agreement to that effect. This doctrine is sometimes spoken of as "legal subrogation," and has long been applied by courts of equity. *Stroh v. O'Hearn*, 176 Mich. 164, 177, 142 N.W. 865. There is also what is known as "conventional subrogation." It arises from an agreement between the debtor and a third person whereby the latter, in consideration that the security of the creditor and all his rights thereunder be vested in him, agrees to make payment of the debt in order to relieve the debtor from a sacrifice of his property due to an enforced sale thereof. It is wholly independent of any interest in the property which the lender may have to protect. It does not, however, inure to a mere volunteer who has no equities which appeal to the conscience of the court.

*Id.* at 580-81, 215 N.W. at 14. Speaking in reference to conventional, or equitable, subrogation, the court in *Stroh v. O'Hearn*, 176 Mich. 164, 142 N.W. 865 (1913), observed:

> Subrogation is an equitable doctrine depending upon no contract or privity, and proper to apply whenever persons other than mere volunteers pay a debt or demand which in equity and good conscience should have been satisfied by another. It is proper in all cases to allow it where injustice would follow its denial, and in allowing it all injustice should be guarded against so far as possible.

*Id.* at 177, 142 N.W. at 879.

As indicated by the quoted language above, the "volunteer" rule has long been a part of Michigan jurisprudence regarding equitable subrogation. Courts have described a "volunteer" in various ways, including one with "no interest to protect" and who, without "benevolent reason, but solely for the purpose of self aggrandizement, inject[s] himself into the already troubled affairs of those interested in the property," *Lentz v. Stoflet*, 280 Mich. 446, 450, 273 N.W. 763, 765 (1937 (quoting *Dunitz v. Woodford Apartments Co.*, 236 Mich. 45, 49, 209 N.W. 809, 810 (1926)); "a stranger . . . paying the debt of another without authority," *Detroit F. & M Ins. Co. v. Aspinall*, 48 Mich. 238, 12 N.W. 214, 215 (1882); a person "showing no interest in the land," *Smith v. Austin*, 9 Mich. 465, 482 (1862); a person lacking some relationship to the property, *see Kelly v. Kelly*, 54 Mich. 30, 47-48, 19 N.W. 580, 588-89 (1884); and a person "without any agreement that the security shall be assigned," *Desot v. Ross*, 95 Mich. 81, 84, 54 N.W. 694, 695 (1893).

6

The following sample of cases illustrates the application of the rule. In *Leser v. Smith*, 219 Mich. 509, 89 N.W. 38 (1922), Leser traded property in Bay City with a store on it to the defendants, Smith and Burnside, for 160 acres of farmland. At the time of the trade, the Bay City property was subject to a mortgage. Soon thereafter, Leser filed suit seeking to have the transaction set aside for fraud. The proceedings in that action are reported at 212 Mich. 558, 180 N.W. 464 (1920). Although the matter was one in equity, the trial court conducted a jury trial and adopted the jury's findings as its basis for setting aside the transaction. Upon review, the Michigan Supreme Court held that the trial court failed to render its own findings, as required in equity. The court conducted a de novo review, concluded that Leser failed to prove fraud, and vacated the trial court's order. While that case was pending, the mortgage on the Bay City property went into foreclosure. At Leser's request, Leser's father mortgaged his own house and redeemed the Bay City property from foreclosure, and Leser, in turn, granted a mortgage to his parents on the Bay City property. Rejecting the defendants' argument that Leser's parents were not entitled to be subrogated to the rights of the prior mortgagee because their payment was voluntary, the court observed:

> In the instant case the son of the plaintiffs, when the money was furnished by the plaintiffs, had obtained a decree in his favor in the court below. The plaintiffs were advised by reputable counsel that they could safely furnish the money. The son could not raise the money, unless helped to do so. The defendant David T. Smith knew of the Kellerman mortgage, and to make sure that it should be paid took from Edward W. Leser a mortgage on the farm that was traded to Mr. Leser. If the Bay City property was not redeemed from the Kellerman forclsure [sic], the title would be lost to Mr. Leser or to Mr. Smith, depending upon the outcome of the pending litigation. When parents come to the relief of their son under such circumstances as in the case before us, we do not think it should be said they are mere volunteers.

*Leser*, 219 Mich. at 512-13, 189 N.W. at 39.

*Smith v. Sprague*, 244 Mich. 577, 222 N.W. 207 (1928), is analogous to *Leser*, although no familial relationship existed at the time the plaintiff made the requested payment. The plaintiff in that case had been married to and divorced from the defendant's son. Following the divorce the

plaintiff remained on friendly terms with her former in-laws, the Spragues, even socializing with them on occasion. The Spragues owned a piece of property subject to a mortgage. When the mortgage went into foreclosure, and apparently as a last resort, Mr. Sprague requested a loan from the plaintiff to pay the mortgage, promising in return to grant the plaintiff a mortgage on the property. The plaintiff made the loan and Mr. Sprague paid off the mortgage. However, Mr. Sprague died shortly thereafter without ever granting the mortgage. While the central issue in the case was whether Mrs. Sprague was bound by Mr. Sprague's promise, the court also found that the plaintiff was not a volunteer:

> The purpose served by the evidence that plaintiff paid the money to satisfy the mortgage at the instance, promise, and request of Mr. Sprague, one of the tenants by the entireties, is that it shows that plaintiff was not a mere volunteer. 25 R.C.L. 1338. And it is a sufficient showing.

*Id.* at 580, 222 N.W. at 208. *Accord Kenrick v. Kenrick*, No. 228571, 2002 WL 31956942, at *3 (Mich. Ct. App. Dec. 20, 2002) (citing *Smith* and concluding that "because intervenor acted at the request of defendant, intervenor was not a mere volunteer").

*Dunitz v. Woodford Apartments*, 236 Mich. 45, 209 N.W. 809 (1926), provides perhaps the best example of a true volunteer or "intermeddler." In that case the plaintiff, a builder "having no connection whatsoever with the property," noticed a delay or interruption in the construction of a large apartment building. Upon further investigation, the plaintiff learned that the property owner had granted a purchase money mortgage to the seller and had also obtained a construction mortgage, which was junior to the purchase money mortgage. He also learned that the first mortgage was in foreclosure and the redemption period was about to expire, that the mortgage holder of the junior mortgage was in receivership, and that there were no funds available to redeem, complete the property, or pay off the mechanics liens against the property. Based upon a statute which permitted the holder of a mechanics lien subject to a prior mortgage to pay off the prior mortgage and become

8

subrogated to the rights of the prior holder, the plaintiff purchased some of the mechanics liens. He then tendered to the successors of the second mortgagee, which by then had redeemed the property, the redemption amount and demanded a deed based upon the statute. The plaintiff filed suit after the successors rejected his demand. The court observed:

> The plaintiff furnished no labor or materials to the construction of this building, but is the holder of liens only because he interested himself in acquiring title to the property and purchased them from the actual owners to accomplish the purpose. Ordinarily, subrogation will not in any event be accorded a purely volunteer. Plaintiff had here no interest to protect until he voluntarily, and for surely no benevolent reason, but solely for the purpose of self aggrandizement, injected himself into the already troubled affairs of those interested in this property. It is clear that one who seeks to be subrogated must show some ground for equitable intervention.

*Id.* at 48-49, 209 N.W. at 810. In spite of its foregoing comments, the court stated that "the record brings the plaintiff dangerously near to being a volunteer without the right of subrogation." *Id.* It appears, however, that the court avoided an express finding that the plaintiff was a volunteer solely to allow it to consider whether the plaintiff could use the mechanics lien statute to obtain the property when it had already been conveyed to the purchaser/second mortgagee. *See id.* at 49-50, 236 N.W. at 810-11.

In *Walker v. Bates*, 244 Mich. 582, 222 N.W. 209 (1928), decided the same day as *Smith v. Sprague*, *supra*, the Bates mortgaged the premises to Commonwealth Federal Savings on January 21, 1921. The mortgage proceeds were used to pay a prior mortgage held by the Highland Park State Bank. At the time, a lis pendens was of record against the premises, giving notice of an earlier suit in which the plaintiffs alleged that the Bates had fraudulently purchased the premises with the plaintiffs' money. The plaintiffs subsequently obtained a judgment against the Bates imposing a lien on the premises. The court held that Commonwealth was entitled to be subrogated to the rights of the prior mortgagee to the extent that Commonwealth's funds were used to satisfy the mortgage.

9

Justice Sharpe, the author of the majority opinion, applied conventional subrogation, apparently based upon Commonwealth's agreement with the Bates to pay off the prior mortgage. He wrote:

> The first mortgage was upon the property when the notice of lis pendens was filed. No injustice results from subjecting plaintiffs' rights thereto. Their interest in the property is charged with the payment of a mortgage lien of the same amount as that which was on it when the lis pendens was filed. The trial court very aptly stated:
>
>> "It is immaterial to the plaintiff and wasn't wronging him any, to just simply change from the Highland Park Bank to the Commonwealth Bank."

*Id.* at 587, 222 N.W. at 210. In his dissenting opinion, Justice Potter focused on the existence of the lis pendens at the time Commonwealth advanced its funds. He wrote:

> [Commonwealth] was, prior to accepting its mortgage, a stranger to the parties and to the title to the premises. In accepting its mortgage it was a volunteer not entitled to subrogation.
>
> . . . .
>
> . . . Defendants paid these sums after notice of lis pendens was filed and their rights must be held subject to plaintiffs' lien. A purchaser who pays a mortgage debt on premises, pursuant to an agreement to assume and pay the same as part of the purchase price, extinguishes the lien and cannot by subrogation avail himself of a mortgage lien to the prejudice of a junior lien claimant.

*Id.* at 584, 586, 222 N.W. at 209-10.

Nine years after *Walker*, the court again considered whether subrogation was available in a case involving a junior lienor, in *Lentz v. Stoflet*, 273 Mich. 446, 273 N.W. 763 (1937). In that case, Mexico and wife gave a mortgage to the Rockwood State Bank covering a 94.72 acre tract, and they subsequently conveyed the premises to Stoflet and wife, subject to the mortgage. Stoflet and wife thereafter mortgaged 68.49 acres of the premises to Rockwood to secure a loan. The Stoflets subsequently defaulted, and Rockwood foreclosed on the mortgages. During the redemption period, the Stoflets mortgaged the 68.49 acre tract to State Savings Bank of Carleton for the sum of $3,100.

10

Subsequently, the plaintiffs loaned the Stoflets funds to pay the Rockwood mortgages, which were discharged. On the same day that the plaintiffs loaned the money to the Stoflets, the Stoflets granted a mortgage to the plaintiffs for the sum of $16,000 upon the 68.49 acre tract and two other parcels of land containing 35.90 acres. The Stoflets did not mention the Carleton mortgage at the time the Stoflets granted the mortgages to the plaintiffs. Justice Sharpe once again authored the majority opinion, but this time he concluded that subrogation should not be allowed. He began the analysis by noting that "[t]he theory of equitable or conventional subrogation is that the junior lienor's position is left unchanged by the conduct of the party seeking subrogation and that he is not wronged any by permitting subrogation." *Id.* at 451, 273 N.W. at 765. The court concluded that the Carleton bank, the junior lienor, would be left worse off if the plaintiffs were subrogated to the Rockwood mortgages because the Rockwood mortgages secured a debt of $6,399.01, whereas the Stoflets' debt to the plaintiffs was $16,000. In addition, the plaintiffs' mortgages covered more property and, thus, it was noted, "[t]he possibility of realizing on any deficiency judgment or decree granted against Stoflet and wife would be lessened because of plaintiffs' prior lien." *Id.* Justice Sharpe added:

> When plaintiffs loaned the money, they had no interests to protect. It was done without any agreement or understanding that they were to enjoy the fruits of subrogation. It was voluntarily done upon their part, and to grant it would not leave defendant in its former position. A mere volunteer is not entitled to subrogation.

*Id.* Justice Potter wrote a concurring opinion, in which he declared that "[t]he effect of the opinion of Mr. Justice Sharpe here is to overrule *Walker v. Bates*." *Id.* He reiterated his view that *Walker* was wrongly decided because Commonwealth loaned money without any agreement or understanding for subrogation, it was a stranger to the title, and a mere volunteer. *See id.* at 455, 273 N.W. at 766. Justice Butzel dissented, noting that the plaintiffs had loaned the funds at the request of the Stoflets in order to pay off the Rockwood mortgages and that nothing was said at the time about the Carleton mortgage. Citing *Leser*, *Smith*, and *Walker*, he stated that the plaintiffs were not

11

volunteers, and further observed that Carleton benefitted from the payment because if the plaintiffs had not paid off the Rockwood mortgages, Carleton would have had to make the payment itself or risk losing its second mortgage through foreclosure.  *See id.* at 456-57, 273 N.W. at 767.

The Michigan Court of Appeals has recently considered the application of equitable subrogation in the context of mortgage refinancing.  In *Washington Mutual Bank v. ShoreBank Corp.*, 267 Mich. App. 111, 703 N.W.2d 486 (2005), the plaintiff bank loaned $392,000 to the borrowers, most of which was used to pay off a prior mortgage in favor of Option One Mortgage Corporation.  At the time the plaintiff made the loan, it was unaware that the borrowers had granted two other mortgages against the property that were of record – a $200,000 mortgage in favor of ShoreBank and a $249,000 mortgage in favor of Standard Federal Bank.  Both of those mortgages were made after the Option One mortgage but were recorded at the time the plaintiff made its loan.  The court held that under the circumstances, the plaintiff was a mere volunteer.  *See id.* at 119-20, 703 N.W.2d at 491.  It agreed with Justice Potter's criticisms of *Walker* and concluded that it was bound to follow the Michigan Supreme Court's most recent pronouncement on the subject in *Lentz*, which it interpreted as holding that "the doctrine of equitable subrogation does not allow a new mortgagee to take the priority of the older mortgage merely because the proceeds of the new mortgage were used to pay off the indebtedness secured by the old mortgage."  The court distinguished other cases, including *Smith*, *supra*, which held that a request for a loan and promise of repayment was sufficient to prevent the plaintiff from being a volunteer, on the basis that the case before it involved the priority of intervening encumbrances, as in *Lentz*, whereas *Smith* did not.  *See id.* at 124-25, 703 N.W.2d at 494.  Of particular interest to the facts of the instant case, however, is the court's discussion of *Schanhite v. Plymouth United Savings Bank*, 277 Mich. 33, 268 N.W. 801 (1936).  The court distinguished *Schanhite* on the grounds that the court in that case relied upon the

12

doctrine of mistake rather than subrogation and also that the court "relied on the well-settled rule that acceptance by a mortgagee of a new mortgage and his cancellation of the old mortgage do not deprive the mortgagee of priority over intervening liens." *Id.* at 126, 703 N.W. at 495. The court noted that this was not the situation before it, but it observed that "had the new mortgage been given to Option One Mortgage, and Option One was before us rather than plaintiff, *Schanhite* might provide the authority to revive the original mortgage and give the new mortgage the same priority as the one it replaced." *Id.* at 127, 703 N.W. at 495.

Another court of appeals panel reached a different conclusion upon similar facts in a subsequent decision in *Ameriquest Mortgage Co. v. Alton*, 271 Mich. App. 801, 726 N.W.2d 424 (2006). In *Ameriquest Mortgage*, the former owner of the property, Yousif, granted a mortgage to Franklin Funding to secure a loan in the amount of $225,000. That mortgage was subsequently assigned to Equity One. Yousif and his wife later obtained a loan and mortgage from Alton in the amount of $86,000, and the mortgage was recorded on March 21, 2003, after the Franklin mortgage. Thereafter, Yousif obtained a loan and mortgage from Ameriquest in the amount of $294,300, which was used to pay off the Franklin loan and obtain a discharge of that mortgage. Although Ameriquest obtained a title search, it did not disclose the Alton mortgage. Yousif defaulted on both the Ameriquest and Alton loans, and Alton foreclosed on his mortgage and obtained a sheriff's deed, which was recorded before the Franklin mortgage discharge was recorded. Ameriquest argued that it was entitled to be subrogated to Franklin's first lien position, even though Ameriquest's mortgage was dated and recorded after Alton's mortgage. The evidence showed that the property was worth $300,000 and that the amount due on the Alton loan was $92,863.42. Thus, Ameriquest would have been substantially prejudiced and Alton would have received a proportionate windfall if Ameriquest's interest were extinguished by the foreclosure. The court recognized that it was bound

by *Washington Mutual* to conclude that Ameriquest was a volunteer not entitled to equitable subrogation, but it noted that if it were not so bound it would have affirmed the trial court's decision granting subrogation on the basis of the Restatement of Property view that equitable subordination may be granted in a mortgage refinancing situation. It thus declared a conflict with *Washington Mutual* and urged the court of appeals to convene a special panel pursuant to M.C.R. 7.215(J). In its analysis of why it would apply equitable subrogation, it relied upon the view of the Restatement of Property, 3d, that subrogation is available to prevent one creditor from receiving an unearned windfall at the expense of another and to prevent unjust enrichment, and concluded that early decisions of the Michigan Supreme Court were consistent with the principles expressed in the Restatement. *See* 726 N.W.2d at 428, 431-32.[2] The court also concluded that *Walker* and *Lentz* were not irreconcilable, as the *Washington Mutual* court had determined, because the equities were different in both cases – the junior creditor was not affected in *Walker*, but the junior creditor was worse off in *Lentz*. *See id.* at 433. Finally, the court noted that an additional complication resulting from *Washington Mutual* is that if *French v. Grand Beach Co.*, 239 Mich. 575, 215 N.W. 13 (1927), quoted in *Walker*, *Lentz*, and *Washington Mutual*, remains good law, an apparent conflict arises between the rule in *Washington Mutual* and *French*, which held that a refinancing lender may compel an assignment of a prior mortgage to acquire its priority position. The court reasoned, "[i]f the assignment of a mortgage priority may be compelled, then the bar to subrogation serves no meaningful purpose." *Id.* at 434.

A special panel of the Michigan Court of Appeals further reviewed the issue and concluded that *Washington Mutual* was correctly decided and that the ruling in *Ameriquest* (applying

---

[2]The portion of the opinion concerning the conflict with *Washington Mutual* was withdrawn after the opinion was issued. However, the Court considers the withdrawn portion as part of the data available to it in its determination of Michigan law.

*Washington Mutual*) should be affirmed. *See Ameriquest Mortgage Co. v. Alton*, Nos. 264213, 264214, 2006 WL 3423151 (Mich. Ct. App. Nov. 28, 2006).[3] The court's analysis gave paramount consideration to the Michigan recording statute, M.C.L. § 565.25(4), which provides that the first recorded mortgage has priority. While it recognized the well-established doctrine of equitable subrogation, it cautioned that a court's equitable powers should be used sparingly and only when "unusual circumstances" are present, such as fraud or mutual mistake. It concluded that

> there exist no conditions or circumstances to warrant application of the equitable subrogation doctrine permitting Ameriquest to circumvent the established priority of Alton's mortgage, based on its earlier recordation, and to assume the position of the prior recorded lien of Franklin Funding. Ameriquest's status as a volunteer is based on its lack of a preexisting interest in the property and the absence of any attempt to continue protection of their interest in the property or to revive or obtain an assignment of the original first mortgage.
>
> . . . Further, because Ameriquest is charged with constructive notice of the existence of Alton's earlier recorded mortgage, it is not entitled to equitable subrogation.

*See also Keybank Nat'l Ass'n v. Ameriquest Mortgage Co.*, No. 242925, 2004 WL 1057814, at *6 (Mich. Ct. App. May 11, 2004) (per curiam) (finding no circumstances warranting the application of equitable subrogation to permit Ameriquest to take priority over Keybank's prior recorded lien where Ameriquest had no preexisting interest in the property and it had constructive knowledge of Keybank's prior lien).

In the instant case, the Court need not decide whether the rule applied in *Washington Mutual* and *Ameriquest Mortgage Co. v. Alton* is a correct application of Michigan law, because here, Van Dyk is in a completely different position than the lenders seeking equitable subordination in those cases. That is, Van Dyk had a preexisting interest in the Property to protect. It was not a mere "intermeddler" or a stranger to the land or a party with no interest to protect. It held a mortgage with

---

[3]Publication pages are not yet available for this document.

first priority, and when it discharged that mortgage and recorded the new mortgage, it was attempting to continue the same interest that it had in the property. In addition, it made the 2004 loan at the request of the Buffums and, pursuant to its agreement with the Buffums, it applied the funds to the 2002 mortgage. In short, Van Dyk was not a volunteer in the ordinary sense or as defined by Michigan law. Moreover, as recognized in *Washington Mutual*, Van Dyk, as the holder of the old mortgage and the new mortgage is the beneficiary of "the well-settled rule that the acceptance by a mortgagee of a new mortgage and his cancellation of the old mortgage do not deprive the mortgagee of priority over intervening liens." *Washington Mut.*, 267 Mich. App. at 126, 703 N.W.2d at 495. The Government acknowledges this rule, but it contends that in order for it to apply, the mortgagee must still be cancelling its mortgage under compulsion, which Van Dyk did not do. This Court disagrees. *Washington Mutual* itself acknowledges that "bolstering of priority may be applicable where the new mortgagee is the holder of the mortgage being paid off *or* where the proceeds of the new mortgage are necessary to preserve the property from foreclosure or another action that would cause the intervening lien holders to lose their security interests." *Id.* at 128, 703 N.W.2d at 496 (italics added). Thus, compulsion is not a necessary condition of the rule. Finally, in this case, Van Dyk did not have actual or constructive notice of the tax lien at the time it made the 2004 loan, nor could it have been aware of the lien through notice, because it was not recorded until several days after the Buffums executed the new mortgage.

      Although the Government concedes that it would not be proper for the Court to weigh the equities at this juncture, it posits that Van Dyk could have done a number of things to protect itself, such as recording the 2004 mortgage when it was executed or conducting an updated title search before it discharged the 2002 mortgage. The Government also points out that as the current lender, Van Dyk was in a better position than a new mortgagee to know the Buffums' true financial

situation, including the potential for intervening liens.  Certainly Van Dyk could have taken other steps to protect itself.  In fact, one might suggest that it could have had instantaneous knowledge of the recording of intervening liens simply by conducting the closing at the counter of the Register of Deeds.  However, Van Dyk did what was reasonable under the circumstances by obtaining a title search that showed the true state of the title.  The other side of the coin, of course, is that the Government would not be any worse off if Van Dyk is subrogated to the rights of the 2002 mortgage because the tax lien was the junior lien at the time it was filed, and the Government would receive a windfall even though Van Dyk never intended to subordinate its position to the tax lien when it discharged the 2002 mortgage.  Thus, Van Dyk may proceed on its claim for equitable subrogation.

## Conclusion

For the foregoing reasons, the Court will grant the Government's motion to dismiss with respect to the unjust enrichment claim and deny the motion with respect to the quiet title/equitable subordination claim.

An Order consistent with this Opinion will be entered.


Dated:  April 5, 2007                                                                    /s/ Gordon J. Quist
                                                                                    GORDON J. QUIST
                                                                        UNITED STATES DISTRICT JUDGE